**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **KELVIN ELY BUSH, II,** | ) |
| **Plaintiff,** | ) |
| **vs.** | ) **Civil Action No.: 24-00484-KD-B** |
| **HEATH JACKSON, *et al.*,** | ) |
| **Defendants.** | ) |

**REPORT AND RECOMMENDATION**

This matter is before the Court on the Motion for Summary Judgment filed by Defendants Heath Jackson and Richard Hetrick. (Doc. 33).[1] Plaintiff Kelvin Ely Bush, II, has responded to the motion (Doc. 38), which is now ripe for review. After careful consideration of the complaint, briefs, arguments, and all evidentiary materials provided in support of and in opposition to the motions for summary judgment, the Court makes the following findings of fact and conclusions of law and **RECOMMENDS** Defendants' Motion for Summary Judgment be **GRANTED**.

## I. Background and Summary Judgment Facts

Plaintiff, Kelvin Ely Bush, a federal inmate, is suing Sheriff Heath Jackson and Warden Richard Hetrick[2] for a "lack of proper

[1] The motion was referred to the undersigned Magistrate Judge for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R).

[2] Defendant Richard Hetrick is the former Warden of the Escambia County Jail. Mr. Hetrick retired in August of 2023 and

security" at the Escambia County Jail, which he claims caused him to be stabbed eight times and hospitalized. (Doc. 1, PageID.4-5).

The record before the Court reveals that Bush was transferred from federal custody to the custody of the Escambia County Jail ("the Jail") on August 13, 2024, for "USMS Safekeeping." (Doc. 25, PageID.153; Doc. 24-4, PageID.141). During intake, Bush disclosed that he had been disciplined for fighting while previously incarcerated and disclosed that he assaulted someone in October of 2022. (Doc. 25-2, PageID.235; Doc. 24-4, PageID.138). Bush was instructed on how to access the inmate handbook and how to file grievances at the Jail. (Id.). Bush was initially placed into Unit 5 at the Jail, with most of the other federal inmates. (Doc. 31-1, PageID.282). But Bush was later moved to Unit 4. When Bush asked why he was moved from Unit 5, "the guard said he had a co-defendant," but Bush does not have a co-defendant.[3] (Doc. 1,

---

James Ward took over as Warden. (Doc. 25 at 2). Mr. Hetrick, however, was acting as interim Warden at the time of the incident in 2024 because Warden Ward was out on medical leave. (Id.). Following Warden Ward's return, Mr. Hetrick went back to retirement. (Id.). Any claims against Mr. Hetrick in his official capacity are due to be dismissed, as he is no longer the Jail Warden. See Fasking v. Allen, Civ. Act. No. 2:18-cv-809-JTA, 2023 WL 2655863, * 11 (M.D. Ala. Mar. 27, 2023). However, substitution of Mr. Hetrick for Warden Ward is unnecessary with the Court's finding that no constitutional violation has occurred, as explained in this report.

[3] Defendants maintain Bush was "moved from Unit 5 to Unit 4 for his disruptive behavior and outbursts in Unit 5" but acknowledge that they "do not have any documentation identifying

PageID.4 (cleaned up); see also Doc. 24-4, PageID.138). Four days after being moved to Unit 4, Bush was involved in a verbal altercation with another inmate that resulted in him being stabbed. (Doc. 31-1, PageID.282).

The offense report submitted by Defendants reflects that on September 15, 2024, Officer Stallworth stated she heard a banging at the back of the Jail and saw inmate Kelvin Bush beating on the window and that he had a bloody hand. (Doc. 25-7, PageID.264). Officer Stallworth got the keys to open the Unit 4 doors and removed Bush. (Id.). After Bush's injuries were assessed, EMS was contacted and Bush was transported to the local hospital by ambulance. (Id.). The following day, Investigator Sergeant Kevin Durden interviewed Inmate Travis Scott ("Scott"), who described his encounter with Bush the previous night. Scott alleged that Bush entered his cell brandishing what Scott called a knife. (Doc. 25-7, PageID.265). According to Scott, in an effort to protect himself, he took the knife from Bush and used it to stab Bush.[4] (Id.; see also Doc. 26, (SEALED) Exhibit 8). He also reported

---

who specifically moved Bush from Unit [5] to Unit [4]." (Doc. 31-1, PageID.282 (cleaned up)).

[4] Inmate Scott stated that he did not know what happened to the knife after the fight with Bush. He claimed that he left the knife on the bed in the cell. (Doc. 25-7, PageID.265; see also Doc. 26, (SEALED) Exhibit 8 (Doc. 25-8)). The interview concluded when Inmate Scott requested an attorney be present for any further questioning. (Doc. 25-7, PageID.265; see also Doc. 26, (SEALED) Exhibit 8 (Doc. 25-8)).

that he had never had any problems with Bush prior to that encounter.

Investigator Durden attempted to interview Bush in the emergency room, but Bush stated he "did not wish to discuss what happened, how he got stabbed, or who stabbed him." (Doc. 25-7, PageID.264-65). Bush did, however, tell the two officers that escorted him to the hospital following the assault, that "he had gotten into a verbal altercation with another inmate and that the two had gotten physical. Bush [stated] that the knife belonged to the inmate that stabbed him, . . . . Bush did not indicate [to the officers] that he knew the inmate that had stabbed him." (Doc. 25-4, PageID.244 and Doc. 25-5, PageID.249). Bush failed to participate in the investigation, and no charges were brought against inmate Travis Scott. (See Doc. 25-1, PageID.175 at ¶ 15; Doc. 25-2, PageID.183 at ¶ 20).

Defendants submitted closed camera video footage of Unit 4, taken on September 15, 2024. The footage begins at 20:22:34 and shows inmates milling around on the first and second floor of the unit.[5] (See Doc. 26 (SEALED), Exhibit J). At 20:27:43-45, a second-floor center cell door opens and Bush emerges wearing white

[5] While Defendants assert that the video footage captures Bush "voluntarily entering the cell of Travis Scott, . . . at 8:22 p.m. while making an aggressive stabbing/jabbing motion", such activity was not observed on the video provided to the Court. (Doc. 25; PageID.154).

pants and a white shirt. There is a small stain (likely blood) detectible on the upper back of his shirt. (See id. at 20:27:43-45). Bush then exits the view of the camera into a cell two doors down. Around 20:30:15, Bush is briefly seen shirtless at a cell door. He then retreats, before emerging from a cell (shirtless) at 20:49:45. He then walks into another cell and emerges a short time later, at 20:59:05, and walks down the stairs to the first-floor common area. Bush stands shirtless at or near the window from 21:00:07 until 21:15:53, often leaning at the window. During this time, one or two unknown inmates (twice) knock and gesture at the unit doors presumably in an effort to solicit help for Bush. (See id. at 20:59:35 and 21:06:10-53). Most of the inmates in the unit continue watching television, playing cards and chess, and walking around. Two officers opened the Unit 4 doors and removed Bush at approximately 21:15:53.[6] (Id.).

Bush was evaluated and received medical treatment at a local hospital for multiple stab wounds to the back, left flank, and lower extremities. (Doc. 31-1; PageID.291). He was found to have a complete right sided pneumothorax, for which he received an emergency chest tube. (Id.). Following stabilization, Bush was discharged from the hospital on September 20, 2024, back to the

[6] Before these officers arrived and before Bush came down to the first floor, the footage shows an officer unlocking the door so another inmate could enter the downstairs area around 20:39:58. (See Doc. 26 (SEALED), Exhibit J).

Jail. (Id.; PageID.296-396). Upon arrival at the Escambia County Jail, the United States Marshals transferred custody of Bush from the Escambia County Jail to the Baldwin County Jail. (See Doc. 24-4; PageID.127-28).

Following a review of the record, the Court converted Defendants' filings to a motion for summary judgment. (See Doc. 33). Defendants assert in their motion for summary judgment that the incident underlying Bush's complaint involved a fight that that he instigated as opposed to the actions or inactions of Defendants. (Doc. 25, PageID.147). Defendants maintain they take reasonable steps to provide for inmate safety, and this single incident fails to establish that they violated Bush's constitutional rights or that they were deliberately indifferent to his safety. (Doc. 25).

After being granted two extensions to respond to the motion, Plaintiff Bush filed a response in opposition to the motion for summary judgment (Doc. 38), where he disputes the Defendants' characterization of the incident as "a fight" and that adequate safety measures were in place and functioning effectively at the time of the stabbing. (Doc. 38-1, PageID.469). Bush maintains that "[b]efore the stabbing, the housing unit and surrounding conditions were not reasonably safe." (Id., PageID.468). According to Bush,

> On or about [9/15/2024], I was in [Escambia County Jail].

> At that time, the conditions I observed included the following:
>
> Lack of officer presence, blind spots, delayed response, unlocked access, inadequate monitoring, threats, prior violence, weapon availability, failure to separate inmates, etc.].
>
> I observed that officers were not present, cameras were not effectively monitored, rounds were infrequent, inmates moved freely, doors/cells were accessible, contraband weapons were present or could be made, prior disturbances occurred, etc.].
>
> These conditions created a serious safety risk to inmates, including me.

(Id., PageID.468) (brackets in original).

This motion has been fully briefed and is ripe for consideration.

**II. Summary Judgment Legal Standards**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'") (emphasis in original) (citation omitted). "An issue of fact is 'material' if it might affect the outcome of the suit under governing law and it is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Ave. CLO Fund, Ltd. v.

Bank of Am., N.A., 723 F.3d 1287, 1294 (11th Cir. 2013) (quotations omitted). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing or pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-24.

Once the moving party has met its burden, "the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial." Dietz v. Smithkline Beecham Corp., 598 F.3d 812, 815 (11th Cir. 2010). This requires the nonmovant to "either point to evidence in the record," Hammer v. Slater, 20

F.3d 1137, 1141 (11th Cir. 1994), or "to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 926 F. Supp. 2d 1286, 1290 (S.D. Ala. 2013) (citing Celotex, 477 U.S. at 324); see also Fed. R. Civ. P. 56(e). The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). At the same time, "the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor." Id.

The requirement to view the facts in favor of the nonmoving party extends only to "genuine" disputes over material facts. Garczynski, 573 F.3d at 1165. "A genuine dispute requires more than 'some metaphysical doubt as to the material facts.'" Id. (citations omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment. Id. In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two different stories,

one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

**III. Discussion**

Read broadly, Bush asserts a generalized risk of violence claim against Defendants Sheriff Jackson and Warden Hetrick. That is, he claims Defendants knew the serious risk of inmate-on-inmate violence at the Escambia County Jail but consciously disregarded it, leading to his injuries. Defendants deny the allegations brought against them and assert the defenses of Eleventh Amendment and qualified immunity. (Doc. 25). Defendants insist that they took reasonable steps to ensure inmate safety at the Jail and further contend that Bush's injuries were caused by a fight that he instigated and that this single incident falls short of establishing a constitutional violation. (Id.).

**A. Immunity Defenses**

To the extent Bush brings claims for monetary damages against the Sheriff and Warden of the Escambia County Jail in their official capacities, his claims are barred by the Eleventh Amendment. The Eleventh Amendment, which prohibits suits against "the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State," has long been held to apply "equally to suits against a state brought in federal court by

citizens of that state." Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998). The state need not be named in the suit, and state officials are also protected by the Eleventh Amendment. Id. (citing Kentucky v. Graham, 473 U.S. 159, 166-67 (1985)). County sheriffs and their deputies, like Sheriff Jackson and the Warden, are employees of the state rather than the County. See Haywood v. Alexander, 121 So. 3d 972, 978 (Ala. 2013); Ex parte Walker, 97 So. 3d 747, 749-53 (Ala. 2012). Accordingly, Sheriff Jackson and Warden Hetrick are entitled to immunity under the Eleventh Amendment and Bush's official capacity claims against them are due to be dismissed because he only seeks monetary damages.

As to Bush's claims against the Defendants in their individual capacities, Sheriff Jackson and Warden Hetrick have asserted the defense of qualified immunity, which generally protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates "'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Marbury v. Warden (Marbury I), 936 F.3d 1227, 1232 (11th Cir. 2019) (citation omitted). Since there is no dispute that the defendants in this action were acting within their discretionary authority when the acts in question occurred, the burden shifts to Plaintiff to show that Defendants violated a constitutional right and that the right was clearly established at the time of the alleged violation. Id. Therefore,

the Court will address whether this action identifies any constitutional violation.

**B. Failure to Protect/Conditions of Confinement Claim**

"The Eighth Amendment, applicable to the states through the Fourteenth Amendment, governs the conditions under which convicted prisoners are confined and the treatment they receive while in prison."[7] Farrow v. West, 320 F.3d 1235, 1242 (11th Cir. 2003). Pursuant to the Eighth Amendment, inmates must be furnished with basic human needs, one of which is "reasonable safety." Helling v. McKinney, 509 U.S. 25, 33 (1993). This includes the right "to be reasonably protected from constant threat of violence . . . by his fellow inmates," i.e., a right to be reasonably protected from an "excessive risk of inmate-on-inmate violence." Purcell ex. Rel. Est. of Morgan v. Tooms Cnty., Ga., 400 F.3d 1313, 1320 (11th Cir. 2005). "To establish a § 1983 claim for deliberate indifference, a plaintiff must show (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Marbury v. Warden III (Marbury III), 2026 U.S. App.

[7] It is unclear from the pleadings if Bush was being held as a pretrial detainee at the time the complaint arose or as a convicted prisoner, i.e., on probation for a previous conviction. The Eighth Amendment applies to convicted inmates, whereas the constitutional rights of pretrial detainees arise from the Due Process clause of the Fourteenth Amendment. See Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1582 n.4 (11th Cir. 1995). Regardless, the standard for liability for failure to protect from harm is the same under both the Eighth and Fourteenth Amendments. Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1024 n.5 (11th Cir. 2001).

LEXIS 19816, at *12-13, 2026 WL 1958923, at *5 (11th Cir. July 7, 2026) (internal quotation marks and citation omitted).

The first element — a substantial risk of serious harm — is measured against an objective standard. Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014). Under this standard, the alleged condition must be "so extreme that it poses an unreasonable risk of serious damage to the prisoner's health or safety." Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam).

The second element — the prison official's deliberate indifference to the risk — "has both a subjective and an objective component." Marbury I, 936 F.3d at 1233. "To satisfy the subjective component, a plaintiff must produce evidence that the defendant 'actually (subjectively) knew that an inmate faced a substantial risk of serious harm.'" Caldwell, 748 F.3d at 1099 (citation and alterations omitted). The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. To meet the objective component, a plaintiff must produce evidence that the defendant disregarded the known substantial risk by failing to respond to it in an objectively reasonable manner. Caldwell, 748 F.3d at 1099. "The known risk of injury must be 'a strong likelihood, rather than a mere possibility' before a [prison official's] failure to

act can constitute deliberate indifference." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam) (citations omitted). Thus, "[m]erely negligent failure to protect an inmate from attack does not justify liability under section 1983[.]" Id. Where more than one defendant is alleged to have been deliberately indifferent, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008).

The third element — causation — requires a plaintiff to demonstrate a link between a defendant's act or omission and the excessive risk of harm, and a link between the risk of harm and the plaintiff's injury. LaMarca v. Turner, 995 F.2d 1526, 1538-39 (11th Cir. 1993).

**1. Substantial Risk of Serious Harm**

For purposes of this motion, the Court accepts as true Bush's version of the incident, including his testimony regarding his placement into Unit 4 and the inmate attack. Based upon a careful review of the record, the Court finds that Bush has failed to put forth probative evidence showing deliberate indifference to an objectively substantial serious risk of harm to him prior to the attack on September 15, 2024.

Bush does not allege or present any evidence that he was aware or fearful of a possible attack at the time it occurred. Nor does the record indicate any such fear, as there were no grievances

filed by Bush while housed in Unit 4. There are no records that Bush and Scott were considered enemies at the time of the attack or even knew each other. Bush does not allege and the record does not suggest that Bush had any enemies at the Jail at the time of the incident. (See Doc. 25-2 at 10). Simply put, Bush has not demonstrated that the Defendants were apprised that any specific inmate at the Jail posed a risk to his health or safety. See McGill v. Duckworth, 944 F.2d 344, 349 (7th Cir. 1991) (stating that a plaintiff "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety"), overruled in part on other grounds by Farmer, 511 U.S. at 828. Thus, no reasonable fact finder could conclude that Defendants acted with intentional or reckless disregard to a known specific risk of harm to Bush.

Bush has also failed to produce probative evidence showing that he faced a generalized, substantial risk of serious harm from inmate violence at the Jail or Unit 4 specifically. At most, Bush presents vague allegations that the security measures at the Jail were "inadequate" and "unsafe" and were the cause of him being stabbed by another inmate." (Doc. 38, PageID.464, 468). He declares under penalty of perjury that there was a "lack of officer presence, blind spots, delayed response, unlocked access, inadequate monitoring, threats, prior violence, weapon availability, failure to separate inmates, etc." (Id.,

PageID.468). According to Bush, "the fact that a stabbing occurred and the weapon was not recovered shows that dangerous conditions and contraband-control failures existed." (Id., PageID.469). He further claims that "[t]he failures in security and supervision allowed the conditions leading to the stabbing to exist" and that genuine issues of material fact remain about the adequacy of staffing, supervision, monitoring, contraband control, officer awareness, preventability, and response," and "[b]ased on what [he] personally observed, the risk of inmate-on-inmate violence was serious and obvious." (Id.).

The Eleventh Circuit has recently clarified that a claim of deliberate indifference based on a generalized risk of violence may only be established by "show[ing] that the prison's conditions were objectively 'extreme and posed an unreasonable risk of serious injury to [an inmate's] future health or safety.'" Marbury III, 2026 U.S. App. LEXIS 19816, at *13, 2026 WL 1958923, at *5 (quoting Marbury I, 936 F.3d at 1233). With respect to serious inmate-on-inmate violence, the plaintiff is required to plead facts that "demonstrate that such violence is 'the norm or something close to it,' such as 'confinement in a prison where violence and terror reign.' . . . Neither 'a generalized awareness of risk' nor the mere presence of 'occasional, isolated attacks by one prisoner on another' will suffice." Id. (quoting Marbury I, 936 F.3d at 1234 (internal citation omitted)). This is accomplished by providing

a history of inmate violence, with "context" to support allegations of violence, or "specific features" of a prison that make it particularly violent. See id. For instance, where a history of violence is alleged, a plaintiff must provide the requisite context to support the statistical allegations, raw data regarding the prevalence of inmate-on-inmate violence, i.e., the total prison population, the sections of the prison where the attacks occurred, or the period of time that the incidents occurred. See id. (quotation marks omitted) (comparing sufficient allegations presented in Marbury III to the insufficient allegations of Marbury I, where Marbury simply put forth the "lone relevant allegation – that he had witnessed 15 stabbings – which was unsupported by any contextual evidence at all."). Otherwise, a plaintiff is required to point to "specific features of a facility or its population rendering it particularly violent[,]" such as "pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence, tensions between different subsets of a prison population, and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness." Marbury I, 936 F.3d at 1234-35 (quotation omitted); cf. Hale v. Tallapoosa Cnty., 50 F.3d 1579 (11th Cir. 1995) (plaintiff survived summary judgment by presenting evidence that the jail was overcrowded; there was only one jailer on duty; the jailer's quarters were out of earshot and eyesight of the prisoners' cell;

there was no policy for classifying and segregating inmates based on their proclivity for violence; and fights occurred between inmates on a regular basis resulting in injuries requiring medical attention and hospitalization); Marsh v. Butler County, Ala., 268 F.3d 1014 (11th Cir. 2001) (en banc) (plaintiff's allegations that jail conditions posed a substantial risk of serious harm were sufficient to overcome a motion to dismiss where plaintiff alleged there was no segregation of nonviolent inmates from violent inmates; the jail was overcrowded at times; the jail was routinely understaffed; cells were not inspected; inmates roamed freely; weapons were readily available; inmates were not adequately screened and classified, nor disciplined for misconduct; and written jail policies were not followed); but cf. Purcell ex. Rel. Est. of Morgan v. Tooms Cnty., Ga., 400 F.3d 1313 (11th Cir. 2005) (no constitutional violation was found where inmates were segregated based on a number of particularized factors (including the type of crime committed and potential personal conflicts with others); the jail was properly staffed (with the typical number of five officers being on duty during the night of the subject attack); officials had a history of addressing and punishing inmate violence; the fights that occurred were not linked to any recurring specific cause; and the guards testified they periodically walked the cellblock); Harrison v. Culliver, 746 F.3d 1288, 1300 (11th Cir. 2014) (plaintiff's evidence of thirty-three incidents of inmate-

on-inmate violence involving weapons over the span of three-and-a-half years, four of which occurred in the same hallway where the plaintiff was assaulted, in a prison which housed between 830 and 990 inmates was found to be "hardly sufficient to demonstrate that [the facility] was a prison 'where violence and terror reign.'" (citation omitted)); Lorenzo v. Williams, CV 616-011, 2018 U.S. Dist. LEXIS 143181, at *13, 2018 WL 3863529, at *7 (S.D. Ga. July 30, 2018) (plaintiff's evidence that the prison had an average of six inmate-on-inmate assaults per month in a population of 1500-1600 in the year the decedent was attacked was determined to be "superficial statistics . . . insufficient to demonstrate a substantial risk of serious harm to inmates at [the prison]").

Here, Bush's only relevant allegations, made in opposition to summary judgment, are "that officers were not present, cameras were not effectively monitored, rounds were infrequent, inmates moved freely, doors/cells were accessible, contraband weapons were present or could be made, prior disturbances occurred, etc.," creating "a serious safety risk to inmates." (Doc. 38, PageID.468, 469). These purely generalized assertions of understaffing and lack of monitoring, however, are not sufficient to show that he faced a substantial risk of serious harm from inmate violence in Unit 4 at the Escambia County Jail. Bush points to no specific features of the Jail or its population rendering it particularly violent. See Marbury I, 936 F.3d at 1235. Further, the record is

devoid of evidence that "serious inmate-on-inmate violence was the norm or something close to it" at the Jail. See id. at 1234. Bush does not claim to have participated in, witnessed, or been the victim of any other incidents of inmate-on-inmate violence at the Jail or in Unit 4, particularly. Nor does he claim to have been threatened with violence by other inmates. Nor has Bush presented evidence that disputes Defendants' evidence, discussed *infra* at Section III.B.2, that inmates were segregated based on a number of particularized factors (including the type of crime committed, potential personal conflicts with others, and proclivity towards violence); that the jail was properly staffed above the typical number of five officers being on duty during the night of the subject attack; that officials had a history of addressing and punishing inmate violence; that the officers patrolled the units; that cameras were utilized to monitor the units; and that contraband searches were conducted at the Jail. Neither has Bush shown that his fight was linked to any recurring specific cause of which the Defendants knew or should have known. Bush has simply failed to carry his burden of identifying "specific facts" showing "that he was in an environment so beset by violence that confinement, by its nature, threatened him with the substantial risk of serious harm." See Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam); Marbury I, 936 F.3d at 1235. His assertions regarding general violence at the Jail and Unit 4

fall well below the evidence presented in both Harrison, Purcell ex. Rel. Est. of Morgan, and Marbury I, *supra*, which the Eleventh Circuit found insufficient to show that inmate-on-inmate violence was so pervasive that it amounted to the substantial risk of serious harm necessary to support a deliberate indifference claim. While Bush's allegations may suffice to establish the "mere possibility" of injury, they plainly fail to carry his burden of establishing a "strong likelihood" of injury. Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990).

Bush has failed to establish a constitutional violation against the Defendants; thus, Defendants are entitled to qualified immunity. Therefore, it is recommended that summary judgment be granted in favor of Defendants.

**2. Deliberate Indifference**

Defendants testify that they have taken all reasonable and feasible safety measures to ensure the safety and security of inmates, including, but not limited to, "the use of video monitoring of inmates, regular inspections and searches of inmates and the Jail for contraband, use of classification systems for inmates to identify dangerous individuals and those that may be vulnerable, training on and implementation of policies designed to deter, prevent, and punish inmate violence, and instituting reporting mechanisms for inmates who feel unsafe." (Doc. 25-1, PageID.172, ¶ 4). These measures are supported by the Jail's

Standard Operating Manual. (See Docs. 24-1; 24-2; 24-3 (SEALED)). Defendants explain that inmates are subject to 24-hour supervision and monitoring from cameras throughout the jail and correctional officers on duty. (Doc. 25-2, PageID.179-80, ¶¶ 8-12). At least one officer is assigned to Master Control and another to the cubical area, and there are monitors in these areas that show live video from the cameras throughout the jail. (Id. at ¶ 11-12). There is always someone monitoring the cameras at the Jail, and the angling of the cameras are periodically reviewed to ensure sufficient monitoring. (Id., ¶ 12). In addition to the camera monitoring, there are usually at least three additional correctional officers on duty each shift that are tasked with regularly patrolling the jail and inspecting the units. (Id. at ¶ 8-9). On the night Bush was stabbed, there were six correctional officers on duty. (Id., PageID.18-29). Notably, there are windows in areas in the units and duty stations that allow officers to observe what is going on inside and outside of the units, without having to fully enter the units. (Doc. 25-3, PageID.239, ¶ 4).

Defendants further testify that active measures are taken to prevent the proliferation of contraband, including weapons, at the Jail. (Doc. 25-2, PageID.177-78, ¶¶ 4-5). For instance, regular unscheduled searches are conducted based on personal observations, observations from camera monitoring, and inmate reports. (Id., ¶ 9). Inmates that are found with contraband, including weapons,

are punished. (Id.). The Jail also implements the usage of the Corrections Emergency Response Team (CERT) from the Alabama Department of Corrections to regularly come to the Jail and assist with conducting unannounced searches and sweeps of all the units. (Id.). Notably, following Bush's stabbing, the record reflects that Investigator Holmes, Deputy Baker, Brewton Police Department Officers, as well as Jail staff conducted a "walk-through of each unit in the detention center." (Doc. 25-7, PageID.264-65). Moreover, inmates are classified for housing based, *inter alia*, on their proclivity for violence (previous incarcerations, assaults, disciplinaries), criminal charges, enemies at the Jail, and gang affiliation. (Doc. 25-2, PageID.181, ¶ 15-16; see also Ex. F. (SEALED) at Doc. 24-3). The Jail also maintains a separate unit, Unit 2, for inmates with behavioral problems or that commit acts of serious violence. (Doc. 25-2, PageID.181, ¶ 16). Federal inmates are generally placed in Unit 5 but can be placed in other units. (Id., ¶ 17). At the time of the complained of incident, 47 federal male inmates were in Unit 5, nine federal male inmates were in Unit 4, three federal male inmates were in Unit 3, four federal male inmates were in the "gym" unit, and one federal male inmate was in Unit 2, and all female federal and state female inmates were housed in Unit 1. (Doc. 31-1, PageID.282-83).

Based on the record before the Court, Defendants have shown that they took "reasonable measures to guarantee the safety of the

inmates" in their custody, Farmer, 511 U.S. at 832-33, and the single incident presented by Bush fails to show that Defendants violated Bush's constitutional rights or were deliberately indifferent to his safety. See Knight v. Lang, 2020 U.S. Dist. LEXIS 22296, at *28, 2020 WL 1018567, at *10 (S.D. Ala. Feb. 7, 2020) (inmate's "subjective beliefs and conclusory allegations regarding the adequacy of security in the housing unit" inadequate).

The record confirms Defendants were not aware of any danger to Bush prior to the September 15, 2024, attack. And no evidence exists to show any danger or special risk to Bush by his movement from Unit 5 to Unit 4. See Carwie v. Mobile Cnty., Ala., No. 1:23-cv-00276-C, 2025 U.S. Dist. LEXIS 14228, at *36, 2025 WL 310142, at *13 (S.D. Ala. Jan. 27, 2025) (noting that "courts have generally declined to impose liability where the complained-of danger resulted from mixing inmate custody classifications." (citation omitted)); see also Powell v. Sheriff, Fulton Cty. Ga., 511 F. App'x 957, 964 (11th Cir. 2013) ("[T]here is no constitutional right, much less a clearly established one, to be held in a particular cell or a separate area of a Jail and not be placed back in the general Jail population."). Additionally, the Jail, including Unit 4, was secure and supervised by camera monitoring at the time of the incident, see Cagle v. Sutherland, 334 F.3d 980, 990 (11th Cir. 2003) ("Closed circuit TV monitoring reflects concern for a prisoner's welfare and a lack of deliberate

indifference.”), and the Jail was adequately staffed with six officers.

The fact that Bush’s stabbing was not averted or that there was an occasional incident of violence does not establish that Sheriff Jackson and Warden Hetrick were deliberately indifferent or were not taking reasonable steps to maintain inmate safety. See Purcell ex rel. Est. of Morgan, 400 F.3d at 1322-23 (finding evidence that inmate fighting occurred at jail and that a few serious fights that occurred were “less severe than what would be sufficient to rise to the level of demonstrating objectively a substantial risk of serious harm to inmates”); see Wade v. McDade, 106 F.4th 1251, 1262 (11th Cir. 2024) (finding the standard for establishing deliberate indifference requires a showing “that the defendant acted with ‘subjective recklessness as used in the criminal law’” and noting that even if a defendant knows about a substantial risk of harm, he or she cannot be found to be deliberately indifferent if he or she responded reasonably to that risk).

**3. Causation**

Finally, Bush has failed to show that Defendants caused his injury. Because Defendants are supervisors, Bush must establish a “casual connection” between their actions and his injury by showing: “(1) the supervisor’s personal involvement in the violation of his constitutional rights, (2) the existence of a

custom or policy that resulted in deliberate indifference to the plaintiff's constitutional rights, (3) facts supporting an inference that the supervisor directed the unlawful action or knowingly failed to prevent it, or (4) a history of widespread abuse that put the supervisor on notice of an alleged deprivation that he then failed to correct." Barr v. Gee, 437 Fed. App'x 865, 875 (11th Cir. 2011).

Here, Bush has failed to allege direct involvement by Defendants Sheriff Jackson and Warden Hetrick, nor has he pointed to a custom or policy that resulted in deliberate indifference to his constitutional rights. He has also failed to show a history of widespread abuse that put Defendants on notice of an alleged deprivation that they then failed to correct. Accordingly, Bush's claims against Defendants fail at every level and Sheriff Jackson and Warden Hetrick are entitled to qualified immunity.

## IV. Conclusion

Based on the forgoing analysis, the undersigned concludes that there are no genuine issues of material fact as to the claims alleged against Defendants Jackson and Hetrick, and Defendants are entitled to judgment as a matter of law on all claims and causes of action asserted by Plaintiff Bush. Therefore, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** on all counts, and that Plaintiff's action against Defendants Heath Jackson and Richard Hetrick be **DISMISSED with prejudice.**

**NOTICE OF RIGHT TO FILE OBJECTIONS**

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within 14 days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or

refers to the briefing before the Magistrate Judge is not specific.

**ORDERED** this **13th** day of **August, 2026.**

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**